On respondent's petition for reconsideration filed May 6, reconsideration allowed; former opinion (227 Or App 553, 206 P3d 1098) modified and adhered to as modified July 8, 2009

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## JOHN CHRISTOPHER KELLY,
*Defendant-Respondent.*

Malheur County Circuit Court
07048406C; A135971

211 P3d 932

Peter Gartlan, Chief Defender, and Rebecca Duncan, Assistant Chief Defender, Office of Public Defense Services, for petition.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

LANDAU, P. J.

LANDAU, P. J.

Defendant petitions for reconsideration of our decision in this case on the ground that there has been a subsequent change in the relevant case law. ORAP 6.25(1)(d). In our prior decision, we concluded that the trial court erred in granting defendant's motion to suppress. *State v. Kelly*, 227 Or App 553, 206 P3d 1098 (2009). Defendant was convicted of driving while under the influence of intoxicants based on evidence obtained during a traffic stop. Defendant, once he had already stopped at a stop sign, signaled his turn in violation of ORS 811.335(1)(b), which requires drivers to "signal continuously during not less than the last 100 feet traveled by the vehicle before turning." The trial court decided that, because defendant signaled for the length of time it would have taken for him to travel 100 feet, he complied with the intent of the statute and, accordingly, that the officer did not have probable cause for the traffic stop. The state appealed, and we reversed.

■ In construing ORS 811.335(1)(b), we applied the interpretive method described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). We determined that the text of ORS 811.335(1)(b) unambiguously requires a driver to signal a turn for the specified distance—not the specified distance *or* its temporal equivalent. Accordingly, we concluded, when defendant did not signal his turn until he had already come to a stop, the police officer had probable cause to believe that defendant had violated ORS 811.335(1)(b). In the course of our analysis of the intended meaning of the statute, we did not discuss its legislative history.

In his petition for reconsideration, defendant contends that, in light of the Supreme Court's recent decision in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), we erred in failing to address the legislative history, which he insists demonstrates that ORS 811.335(1)(b) was intended to require signaling for a certain duration of time, not a specified distance. As he did in his previous briefing to us, defendant argues that a signaling requirement expressed purely in terms of distance is, at least sometimes, impossible and could

lead to absurd results. We allow reconsideration, modify our prior opinion, and adhere to our prior opinion as modified.

We begin with the Supreme Court's decision in *Gaines* and the extent to which it alters the familiar interpretive method set out in *PGE*. In *Gaines*, the issue was the effect, if any, of the legislature's enactment of amendments to ORS 174.020, so that the statute now provides that "[t]o assist a court in its construction of a statute, a party may offer the legislative history of the statute." ORS 174.020(1)(b). The amendments further provide that "[a] court shall give the weight to the legislative history that the court considers to be appropriate." ORS 174.020(3). Specifically, the question was whether those amendments altered one of the principal components of the *PGE* approach to statutory construction, *viz.*, the necessity of establishing an ambiguity in statutory wording as a condition of resorting to legislative history. *See PGE*, 317 Or at 611 ("If, but only if, the intent of the legislature is not clear from the text and context inquiry, the court will then move to the second level, which is to consider legislative history * * *.").

In *Gaines*, the Supreme Court concluded that the legislature, in enacting the amendments to ORS 174.020, did indeed intend to "remove the barrier that the *PGE* methodology placed on the consideration of legislative history and instead place legislative history on a par with text and context." *Gaines*, 346 Or at 169. The legislature, the court explained, "intended to ease the unyielding 'if, but only if' constraint that *PGE* appeared to have placed on the court's ability to even review and consider otherwise pertinent legislative history." *Gaines*, 346 Or at 169. In light of the amendments to ORS 174.020, the court concluded, a "minor" adjustment to the *PGE* approach to statutory construction was required:

> "We therefore conclude that, in light of the 2001 amendments to ORS 174.020, the appropriate methodology for interpreting a statute is as follows. The first step remains an examination of text and context. *PGE*, 317 Or at 610-11. But, contrary to this court's pronouncement in *PGE, we no longer will require an ambiguity in the text of a statute as a necessary predicate to the second step*—consideration of pertinent legislative history that a party may proffer. Instead,

a party is free to proffer legislative history to the court, and *the court will consult it after examining text and context, even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis.*"

*Gaines*, 346 Or at 171-72 (emphasis added).

In announcing that modification, the *Gaines* court cautioned that, even though legislative history now may be considered in conjunction with first-level textual analysis, the reasonable construction of the words of the statute itself continues to be the focus of statutory construction. That is so, the court explained, because "[o]nly the text of a statute receives the consideration and approval of a majority of the members of the legislature," as the constitution requires. *Id.* at 171. The formal requirements of the constitutional lawmaking process "produce the best source from which to discern the legislature's intent," the court explained, "for it is not the intent of the individual legislators that governs, but the intent of the legislature as formally enacted into law." *Id.*

In light of the court's opinion in *Gaines*, we conclude that defendant's petition for reconsideration is warranted. *Gaines* did alter the rules that apply to the interpretation of statutes in this state. We turn, then, to the question whether that change in the rules of interpretation leads to a change in the result of this case.

Defendant contends that the legislative history of ORS 811.335(1)(b) shows that "the legislature was concerned about the *duration* of a signal," not about whether the signal occurred over a particular distance. (Emphasis in original.) Defendant relies on comments of various legislators and witnesses during the enactment process that led to the adoption of what became ORS 811.335(1)(b). Defendant's reliance on those statements, however, is misplaced.

In that regard, it is perhaps useful for us to set out several considerations concerning our review of the legislative history and the weight that we will assign to it. At the outset, it bears emphasis that, under ORS 174.020(3), we are to "give the weight to the legislative history that the court

considers to be appropriate." As the Supreme Court recognized in *Gaines*, under that provision "[a] court need only consider legislative history 'for what it's worth'—and what it is worth is for the court to determine." 346 Or at 171.

In some cases, the legislative history—however clearly it may express the legislature's intentions—is worth precisely nothing, because the text of the statute is capable of one, and only one, reasonable construction. As the Supreme Court explained in *Gaines*,

> "a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it. Legislative history may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute. * * * *When the text of a statute is truly capable of only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different.*"

*Id.* at 172-73 (footnotes omitted; emphasis added).

In other cases, the weight that a court will give to the legislative history will depend on a number of different considerations.

First, it must be remembered that the purpose of resorting to legislative history is to aid the court in determining what the legislature as an institution intended the statute to mean. As the Supreme Court commented in *Gaines*, " '[i]n general, an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment.' " 346 Or at 172-73 n 9 (quoting *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995) (Graber, J., dissenting)). Cherry-picked quotations from single legislators or of non-legislator witnesses are likely to be given little weight, as the likelihood that such scraps of legislative history represent the views of the institution as a whole is slim. *Errand*, 320 Or at 539 n 4 (Graber, J., dissenting), *quoted in Gaines*, 346 Or at 172-73 n 9 (reliance on "the beliefs of a single legislator or witness" is "fraught with the potential for misconstruction");

*State v. Stamper*, 197 Or App 413, 424-25, 106 P3d 172, *rev den*, 339 Or 230 (2005) ("we are hesitant to ascribe to the Legislative Assembly as a whole the single remark of a single nonlegislator at a committee hearing"); *Linn-Benton-Lincoln Ed. v. Linn-Benton-Lincoln ESD*, 163 Or App 558, 569, 989 P2d 25 (1999) ("we are reluctant to draw decisive inferences concerning legislative intent [because] * * * the statements were made by witnesses and are not direct expressions of legislative intent").

In some cases, statements of individual legislators and even nonlegislators may be entitled to some weight. But the amount of weight will depend on the extent to which a case can be made that they are reflective of the intentions of the legislature as a whole. In the case of statements of individual legislators, the weight accorded often depends on whether the legislator is the author, sponsor, or carrier of a bill or in some other leadership position. *See, e.g., Bobo v. Kulongoski*, 338 Or 111, 117-18, 107 P3d 18 (2005) (relying on comments of the Joint Committee on Ways and Means cochair about the meaning of "kicker" legislation); *O'Donnell-Lamont and Lamont*, 337 Or 86, 105 n 9, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005) (statement of bill sponsor in committee). In the case of nonlegislator statements, courts tend to be more wary, but do accord them some weight when the nonlegislators sponsored the legislation and who, as a result, are in a good position to describe its purpose and intended effect. *See, e.g., Ram Technical Services, Inc. v. Koresko*, 346 Or 215, 234-35, 208 P3d 950 (2009) (relying on testimony of the representative of the Oregon Law Commission, which proposed the legislation at issue); *Zidell Marine Corp. v. West Painting, Inc.*, 322 Or 347, 357-58, 906 P2d 809 (1995) (construing terms in the statutes governing the writ of continuing garnishment and relying on testimony of representatives of the Oregon Collectors Association, which proposed the bill).

Second, the weight that a court accords legislative history will vary with the clarity with which it reveals the legislature's intentions as to the statutory construction dispute in issue. Said another way, the more clearly the history speaks to the meaning of the disputed terms in issue, the more weight the history will be accorded. *See, e.g., SAIF v.*

*Drews*, 318 Or 1, 8, 860 P2d 254 (1993) (statement of legislator before legislative committee: "[T]his will do away with the current court interpretations of what is a new injury for responsibility purposes. Do you hear that, judges on the Court of Appeals * * *?" (Emphasis omitted.)).

The legislative history may reveal more general information about the purpose of an enactment, usually by reference to a particular problem that precipitated a bill. But the fact that a particular problem precipitated a bill does not necessarily mean that the legislature intended the enactment to be given only such meaning as will address that particular problem; often, legislatures respond to particular issues by enacting very broadly worded statutes. *See, e.g.*, *Hamilton v. Paynter*, 342 Or 48, 55, 149 P3d 131 (2006) ("the statutory text shows that, even if the legislature had a particular problem in mind, it chose to use a broader solution"); *South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986) ("Statutes ordinarily are drafted in order to address some known or identifiable problem, but the chosen solution may not always be narrowly confined to the precise problem. The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention.").

With those principles in mind, we turn to the legislative history of ORS 811.335(1)(b). The requirement that a driver signal a turn for a given distance dates back to the 1920s. Under the law at that time, if stopping, starting, or turning a vehicle would affect a pedestrian, the driver of the vehicle was required to honk the vehicle's horn. Oregon Code, title LV, ch 7, § 55-706 (1930). If such actions would affect the operation of another vehicle, the driver was required to signal an intention to stop, start, or turn either by an electrical signal device or by hand signals. *Id.* The statute was amended in 1935 (and apparently renumbered) to require any turn signal to be given "continuously during the last fifty [50] feet traveled by the vehicle before turning." Oregon Code, title LV, ch 23, § 55-2309(b) (Supp 1935) (brackets in original).

The statute remained substantially unchanged for the next 30 years. In 1965, the legislature amended the statute to require signaling for "not less than the last 100 feet traveled by the vehicle before turning." Or Laws 1965, ch 104, § 1. The bill was introduced at the request of the Department of Motor Vehicles (DMV), following its participation on a legislative interim committee charged with addressing the subject. Testimony, Senate Committee on Highways, SB 14, Feb 5, 1965 (statement of Vinita Howard). DMV wanted to amend the existing law to bring it into conformity with the Uniform Vehicle Code, which required signaling for 100 feet before turning, not 50 feet, as in the current Oregon statute. *Id.* The interim committee, however, believed that a compromise was in order and drafted amendments that would have required signaling for 100 feet of distance only if the designated speed for the area was at least 35 miles per hour.

The interim committee's bill was introduced as Senate Bill 14 during the 1965 legislative session. At the first hearing on the bill, an attorney for DMV, Leonard Pearlman, explained that

> "[t]he present code states that the signal required before turning to the right or left shall be given continuously during the last 50 feet travelled by the vehicle before turning. This distance does not conform to the 100 feet prescribed by the Uniform Vehicle Code since 1956 and more importantly the 50 foot distance is inadequate due to the higher speeds travelled today * * *."

Minutes, Senate Committee on Highways, SB 14, Jan 20, 1965, 1. After a brief discussion of unrelated matters, the hearing on the bill was continued. *Id.* at 1-2. At the next hearing, Vinita Howard, Assistant Manager of the Traffic Safety and Education Division of DMV, provided further background on the proposed legislation. Minutes, Senate Committee on Highways, SB 14, Feb 5, 1965, 1-2. She explained that the purpose of the bill was "to correlate the distance of the signal" with modern vehicle speeds. Testimony, Senate Committee on Highways, SB 14, Feb 5, 1965 (statement of Vinita Howard). She noted that 35 other states followed the Uniform Vehicle Code provision calling for a signal "during not less than the last 100 feet before turning." *Id.*

She commented that, while DMV favored the Uniform Vehicle Code approach, the interim committee's approach "is an acceptable substitute and still superior to the present provision." *Id.*

Interestingly, Howard also pointed out that at least one other state—Washington—took a different approach, namely, giving a vehicle the option of signaling for a specified period of time defined by the "period of time not less than that time required to traverse a distance in feet equal to five times the maximum speed in miles per hour allowed by law during the approach to the point of turning." *Id.* Howard commented wryly that "[i]t would seem that the driver lacking in mathematical agility, would have considerable difficulty in attempting to comply with Washington's law." *Id.* She explained that, in the view of DMV, the proposed 100-feet-of-distance standard, "while seemingly requiring needless signal from a driver, is actually fairer to motorists. It provides a definite standard for the driver * * *." *Id.* The committee sent the bill to the Senate floor with a do-pass recommendation, and the Senate approved the bill.

On the House side, Howard again testified, explaining the purpose of the amendments and their relationship to the Uniform Vehicle Code. Minutes, House Committee on Highways, SB 14, Mar 3, 1965, 1-2. One member of the House Committee on Highways, Representative John Dellenback, commented that he would be inclined to require 100 feet of continuous signaling in all cases, not just in 35-miles-per-hour areas. *Id.* at 2. Another member, Representative W. H. Holmstrom, who had served on the interim committee, explained that "it is not practical to expect the motorist to signal 100 ft. in advance before changing lanes. Sometimes it would be physically impossible for the motorist to do so * * *." *Id.* Initially, at least, the House committee agreed with Holmstrom and moved the bill to the floor with a do-pass recommendation (with only the committee chair dissenting) as approved by the Senate. *Id.* Several days later, however, the committee reconsidered. The chair asked the committee to amend the bill and require 100 feet of continuous signaling in all cases, not just in 35-miles-per-hour speed zones. Minutes, House Committee on Highways, SB 14, Mar 8, 1965, 3. Holmstrom objected, complaining that, "if the law

required signaling 100' before turning in all cases, it would be necessary for people, in some cases, to operate their vehicles illegally." *Id.* The committee approved the amendment over Holmstrom's objection. *Id.* The bill was ultimately approved by both houses in that form.

We turn to the significance of the foregoing legislative history. We begin by noting that we adhere to the conclusion of our original opinion that the text of ORS 811.335(1)(b) appears to be plain and unambiguous. It requires continuous signaling for a specified distance: "not less than the last 100 feet traveled." Accordingly, as the Supreme Court stated in *Gaines*, defendant "has a difficult task" in attempting to persuade us that the statute does not mean what it appears so plainly to say. 346 Or at 172.

In our view, defendant did not meet his burden. To the contrary, the legislative history confirms precisely what we have concluded the text unambiguously declares. The representatives of the agency requesting the bill repeatedly explained that it was necessary "to correlate the *distance* of the signal" with current vehicle speeds. (Emphasis added.) It is true that such statements were made by a nonlegislator witness. But, as we have noted, when such a witness represents the original sponsor of legislation and when it is clear that legislators relied on the witness's statements, those statements are regarded as reliable indicators of legislative intent. *See, e.g., Ram Technical Services, Inc.*, 346 Or at 234-35 (relying on statements of a representative of the Oregon Law Commission). That is the case here.

Defendant is correct that, in calculating the appropriate distance requirement, there was some discussion of the time needed to adequately signal at various speeds. But defendant ignores the fact that the end result of that calculation was a distance requirement. In fact, as we have noted, the DMV representative noted that another state, Washington, adopted a statute that expressed the signaling requirement in terms of duration and not distance. The Oregon legislature, however, did not choose to follow that model and chose instead (because of the difficulties of expressing a signaling requirement in terms of time, which necessarily would vary

with speed) to use distance as the basis for prescribing when a turn signal is required.

Moreover, the legislature considered the possibility that requiring signaling for a uniform 100 feet of distance might, in some cases, be "impossible." As we have noted, Representative Holmstrom advanced precisely that objection. Over that objection, the committee approved the proposed amendment that led to the enactment of the law in its current form.

We therefore adhere to our original conclusion that ORS 811.335(1)(b) requires a person to signal continuously during not less than the last 100 feet traveled by the vehicle before turning. When the officer in this case observed defendant failing to do so, the officer had probable cause to believe that defendant violated the statute. As we previously held, therefore, the trial court erred in concluding otherwise and in granting defendant's motion to suppress.

Reconsideration allowed; former opinion modified and adhered to as modified.