Argued and submitted October 28, 2009, convictions for laundering a monetary instrument reversed; remanded for resentencing; otherwise affirmed February 16, 2011

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## EDWARD ANATOLYEVIC KHOLSTININ,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0700901; A137717

249 P3d 133

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Carson, Senior Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Defendant was convicted of 24 counts of identity theft, ORS 165.800, and nine counts of laundering a monetary instrument, ORS 164.170. He raises several assignments of error on appeal. We agree with defendant on one of them—that the court erred in denying his motion for a judgment of acquittal on the money-laundering counts—but we reject the other assignments of error without discussion. Accordingly, we reverse defendant's convictions for laundering a monetary instrument and remand for resentencing.

Because our review concerns the denial of a motion for a judgment of acquittal, we state the facts in the light most favorable to the state. *State v. Rader*, 348 Or 81, 83, 228 P3d 552 (2010). Defendant requested a refund at a Cash Connection store in Portland of an unsuccessful Western Union wire transfer of funds to Russia. The next day, he appeared at a Cash Connection store in Clackamas County and requested a refund of another unsuccessful Western Union wire transfer of funds to Russia. As it turned out, the same Cash Connection employee handled both transactions, and she realized that defendant had used different names and identifications to request the two refunds. While defendant was in the store, the employee called the police to report her observations, which led the Clackamas County Sheriff's Office to send two officers to the store to investigate.

One officer approached defendant in the store and asked for identification. Defendant supplied identification in his true name and, thus, immediately established that he had used falsified identification for both refund requests. The officer proceeded to arrest defendant for identity theft. An ensuing search of defendant and, pursuant to a warrant, of defendant's rental car produced a large number of Texas driver's licenses, each with a different name but all with a photograph of defendant; approximately $80,000 in cash; Western Union and Moneygram receipts for wire transfers to Russia; and a large number of prepaid credit cards that were subsequently determined to have been encoded with account numbers of Wells Fargo customers and used in a series of fraudulent ATM withdrawals.

In addition to the 24 counts of identity theft of which he was convicted, defendant was charged with nine counts of money laundering. Each money-laundering count alleged that, on a specified date, defendant "did unlawfully and knowingly transfer or attempt to transfer funds with the intent to promote the carrying on of unlawful activity." Those counts were based on ORS 164.170(1)(b)(A), which provides:

"A person commits the crime of laundering a monetary instrument if the person:

"* * * * *

"(b)   Transports, transmits or transfers or attempts to transport, transmit or transfer a monetary instrument or funds:

"(A)   With the intent to promote the carrying on of unlawful activity[.]"

Defendant had used the credit cards to make numerous fraudulent withdrawals of cash from ATMs, mostly in California. On the days identified in the indictment, he used the fraudulently obtained cash to send, or attempt to send, funds to Russia through Western Union and Moneygram wire transfers.

At the end of the state's case, and at the close of all the evidence, defendant moved for a judgment of acquittal on the money-laundering counts on the ground that the state had not offered any evidence from which the jury could find that defendant's intent in transferring or attempting to transfer the funds was to promote the carrying on of unlawful activity. The state responded that the evidence in the record would permit the jury to find that defendant had made the transfers to avoid federal transaction-reporting requirements, to evade taxes, or to otherwise separate him from the stolen money, each of which, according to the state, would constitute the carrying on of unlawful activity. The trial court denied the motion, and the jury convicted defendant of all of the money-laundering counts.

On appeal, the parties basically reprise their trial arguments. Those arguments reflect an ongoing debate about the federal money-laundering statutes on which the Oregon money-laundering statutes are based. The focus of that

debate is the distinction that the federal and Oregon money-laundering statutes draw between financial transactions that are conducted with the intent to promote the carrying on of unlawful activity—the promotion prohibition—and those conducted with knowledge that the transactions are designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds or to avoid a federal transaction-reporting requirement—the concealment prohibition.

Defendant was charged with violating the Oregon counterpart of the promotion prohibition, not the conceal-ment prohibition.[1] As we will explain, that matters. There has been no disagreement among the federal courts about the meaning and reach of the concealment prohibition. However, there has been a distinct split among the federal circuit courts about the reach of the promotion prohibition.

According to some commentators and federal circuit courts, the promotion prohibition is intended to reach trans-actions through which criminal actors and enterprises fund their ongoing, that is, future, criminal activities. It is not intended to reach transactions by which criminal actors and enterprises facilitate or complete the unlawful activities that produced the proceeds that are the subject of the transac-tions. *See, e.g., United States v. Heaps*, 39 F3d 479, 484-86 (4th Cir 1994); *United States v. Jackson*, 935 F2d 832, 840-42 (7th Cir 1991); Maura E. Fenningham, Note, *A Full Laundering Cycle Is Required: Plowing Back the Proceeds to Carry on*

---

[1] The Oregon version of the concealment prohibition that is the counterpart of the promotion prohibition under which defendant was charged is ORS 164.170(1)(b)(B). It provides:

"A person commits the crime of laundering a monetary instrument if the person:

"* * * * *

"(b) Transports, transmits or transfers or attempts to transport, transmit or transfer a monetary instrument or funds:

"* * * * *

"(B) Knowing that the monetary instrument or funds involved in the transportation, transmission or transfer represent the proceeds of some form, though not necessarily which form, of unlawful activity and knowing that the transportation, transmission or transfer is designed, in whole or in part, to:

"(i) Conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity; or

"(ii) Avoid a transaction reporting requirement under federal law[.]"

*Crime IS the Crime Under 18 U.S.C. § 1956(a)(1)(A)(i)*, 70 Notre Dame L Rev 891, 893-94, 916-39 (1995). In contrast, the concealment prohibition is intended to reach transactions through which criminal actors and enterprises are able to separate the proceeds from their unlawful source and thereby make the proceeds available for use by them for any purpose. In other words, the concealment prohibition applies without regard to the intended use of the proceeds.

*United States v. Jackson*, 935 F2d 832 (7th Cir 1991), exemplifies the foregoing understanding of the federal money-laundering statutes. *Jackson* involved the conviction of several individuals for conspiring to distribute crack cocaine. Among those individuals was a minister, Davis, who also was convicted of one count of engaging in a continuing criminal enterprise and three counts of money laundering. The money-laundering counts concerned funds derived from Davis's drug-dealing enterprise that were deposited in church bank accounts and then used to issue checks to pay for beepers and related services for use in the criminal enterprise, to acquire mobile phones for Davis, to pay his rent, and to provide him with cash.

On appeal, the Seventh Circuit concluded that the transactions involving the beepers came within the federal promotion prohibition because the beepers were used in the drug-dealing enterprise. However, the other transactions—which benefited Davis personally rather than the enterprise—did not come within that prohibition but, rather, came within the concealment prohibition. As the court explained, the two prohibitions

> "are aimed at different activities, the first at the practice of plowing back proceeds of 'specified unlawful activity' to promote that activity, the second at hiding the proceeds of the activity. The different aims suggest that the prosecution in a money laundering case will generally make its case under one provision or the other; only in the unusual case will the government be able to prove that a single transaction was intended to both promote an illegal activity *and* conceal the origin of the funds used in that activity."

*Id.* at 842 (emphasis in original).

Other federal circuits have adopted a more expansive understanding of the promotion prohibition, one in which the prohibition is understood to apply to transactions that promote, that is, that complete or make successful, the very activity that gave rise to the proceeds that are the subject of the transaction. Under that view, the prohibition is *not* limited to transactions intended to promote future unlawful activity, that is, to plow the proceeds of unlawful activity back into a criminal activity or enterprise to fund new criminal activity.

*United States v. Montoya*, 945 F2d 1068 (9th Cir 1991), exemplifies that understanding. It involved convictions of a California state senator, Montoya, for racketeering, Hobbs Act violations, and money laundering arising from a federal sting operation directed toward corrupt state legislators and their staff. The money-laundering count related to Montoya's deposit into his personal checking account of a $3,000 check that he had received as a bribe from a fictitious FBI front company for his support of a proposed bill.

Montoya argued on appeal that he was entitled to an acquittal on the money-laundering count because there was no evidence that his deposit of the check was intended to promote the carrying on of unlawful activity. The court disagreed. It reasoned that the check was of no use or value to Montoya until he deposited it, so depositing it promoted the carrying on of the bribery activity, itself; that is, the deposit promoted the unlawful activity that gave rise to the check that he had deposited. *Id.* at 1076.

Cases in several other federal circuits have used similar reasoning to uphold money-laundering convictions under the promotion prohibition. It is noteworthy, however, that in each case the court understood the relevant transaction to be one that *had* to occur in order to enable those involved in the unlawful activity to obtain the benefit of that activity. In other words, but for the transaction at issue in each case, the unlawful activity would have accomplished nothing. It was on that basis that the courts upheld the money-laundering convictions on the ground that the transactions promoted the very activity that produced the proceeds that were the subject of the transactions; that is, the

transactions promoted the carrying on of the unlawful activity that preceded them. *See, e.g., United States v. Piervinanzi*, 23 F3d 670, 679-83 (2d Cir), *cert den*, 513 US 904 (1994) (attempted overseas wire transfer promoted bank fraud that was the source of the funds intended to be transferred because transfer necessary to get funds to those committing the fraud); *United States v. Paramo*, 998 F2d 1212, 1216-18 (3d Cir 1993), *cert den*, 510 US 1121 (1994) (deposit of fraudulently obtained IRS refund checks promoted mail fraud that produced the checks because transaction was necessary to create value out of otherwise unremunerative mail fraud).

Oregon adopted its money-laundering statutes in 1999 and modeled them on the federal statutes. At that time, the split described above among the federal circuit courts— the split between those that understood the promotion prohibition to apply only to those transactions intended to promote future unlawful activity and those that understood it to apply to transactions intended to promote prior as well as future unlawful activity—was well developed. However, nothing in the legislative history of the Oregon statutes indicates that those who drafted, supported, and voted for the Oregon statutes were aware of the split and, based on that awareness, intended to adopt the view of one side over the other.

■ Nevertheless, our review of the legislative history leads us to conclude that the Oregon legislature intended the Oregon statutes that prohibit transactions intended to promote the carrying on of unlawful activity to apply only to those transactions intended to promote future unlawful activity. Our conclusion is based on two aspects of that history: testimony by Karin Immergut, who was then a Multnomah County deputy district attorney and who took the lead in explaining and supporting the proposed legislation throughout the legislative process, and summaries of the legislation prepared by the staff of the House and Senate Judiciary Committees.

As an initial matter, Immergut's testimony, as well as the testimony of the other proponents, makes clear that the Oregon money-laundering statutes were modeled on the equivalent federal statutes and were intended to function the

same way. If that were the extent of the legislative history, we might have to resolve which group of federal circuit courts had the correct understanding of the federal statutes in order to determine the intended meaning of the Oregon statutes. *See, e.g., McKean-Coffman v. Employment Div.*, 312 Or 543, 550, 824 P2d 410, *adh'd to on recons*, 314 Or 645, 842 P2d 380 (1992) ("Because Oregon adopted the federal language virtually verbatim, federal legislative history pertaining to the federal language is persuasive in interpreting the purpose of [the Oregon analogue].").

However, Immergut went on to explain the intended function of the legislation in a way that specifically tracks the view of the federal statute that limits the application of the promotion prohibition to transactions intended to promote future unlawful activity, that is, to those intended to put funds back into the criminal activity or enterprise. She testified:

> "Every criminal who commits a crime essentially has two problems. They first have to commit the crime itself, be it drug dealing, check forging, fencing stolen property. *And secondly, they have to dispose of the money that they've gained from the crime either to bring it back into the business to facilitate their continuing enterprise or dispose of it in a way that they can spend it in the future to their benefit without being caught.* In essence, what a criminal does with [his or her] money, whether it's spending, reinvesting, or hiding money is what money laundering is. Essentially, most schemes involving money laundering are efforts to make money appear legitimate even though the money is, in fact, illegal proceeds from a crime."

Tape Recording, House Committee on Judiciary, Subcommittee on Criminal Law, HB 2319, Mar 9, 1999, Tape 76, Side A (statement of Karin Immergut) (emphasis added).

The emphasized statement describes the core distinction in the federal and Oregon statutes between the promotion prohibition and the concealment prohibition. And, critically, the explanation of the intended function of the promotion prohibition identifies its function as reaching transactions that are intended to plow money back into an ongoing criminal activity or enterprise.

The measure summaries for the legislation prepared by the staff of the House and Senate Judiciary Committees make the same point. The critical statement on the issue in both summaries is virtually identical, so we quote only one of them, the House summary. It says, in part:

> **"WHAT THE BILL DOES:** Creates crime of Laundering a Monetary Instrument and crime of Engaging in Monetary Transaction in Property Derived from Unlawful Activity. * * *
>
> "Money Laundering is defined as conducting, or attempting to conduct, a financial transaction, knowing that the proceeds were derived unlawfully, with 1) *the intent to promote further unlawful activity*, or 2) knowing that the transaction is designed to conceal the activity, or avoid a reporting requirement under federal law."

Staff Measure Summary, House Committee on Judiciary, Subcommittee on Criminal Law, HB 2319, Apr 19, 1999 (boldface and capitalization in original; emphasis added). The emphasized statement tracks Immergut's statement that the focus of the promotion prohibition is on transactions that are intended to promote further or future unlawful activity. Although the measure summaries note that the summaries were not adopted or endorsed by their respective committees, they nonetheless represent staff statements about the intended function of the proposed legislation that we may consider in our effort to determine the intended meaning of the Oregon statutes.[2]

Finally, nothing in the legislative history suggests that legislators were told or understood that the Oregon statutes were intended to function differently from the way in which Immergut and the measure summaries described them to function. More specifically, nothing in the legislative history supports an understanding that the promotion prohibition was intended to reach prior as well as future unlawful activity, that is, that it was intended to do what the

---

[2] *See, e.g., State v. Jansen*, 198 Or App 260, 265 n 3, 108 P3d 92 (2005) (staff measure summaries considered in determining legislative intent); *cf. State v. Kelly*, 229 Or App 461, 465-68, 211 P3d 932, *rev den*, 347 Or 446 (2009) (discussion of sources and use of legislative history).

Second, Third, and Ninth Circuits have held that the equivalent federal prohibition is intended to do.

In light of the foregoing legislative history, we are persuaded that the Oregon legislature intended the Oregon money-laundering statutes that prohibit transactions or transfers of funds intended to promote the carrying on of unlawful activity to apply only to transfers intended to promote future or ongoing unlawful activity. Based on that understanding of the Oregon statutes, the trial court erred in denying defendant's motion for a judgment of acquittal on the money-laundering counts in this case.

■ As noted earlier, those counts were based on ORS 164.170(1)(b)(A), which, among other elements, required the state to prove that the wire transfers or attempted transfers of funds to recipients in Russia were intended to promote the carrying on of unlawful activity. There is no evidence in this record from which the jury could find that the transfer of funds to Russia was intended to fund or promote future unlawful activity in Russia or anywhere else. Hence, the trial court erred in denying defendant's motion for a judgment of acquittal on those counts.

Moreover, that would be true even if the Oregon statutes were intended to reach prior, not just future, unlawful activity in the way that some of the federal circuit courts have held that the equivalent federal statutes are intended to reach. As explained above, the federal cases applying that principle have done so in circumstances in which the relevant transaction had to occur in order to enable those involved in the unlawful activity to obtain the intended benefit of the unlawful activity: money. But for the transaction at issue in each case, the unlawful activity would have accomplished nothing; hence, the transaction promoted the carrying on of the preceding unlawful activity.

Here, defendant used fraudulent credit cards to obtain cash from ATMs. Because defendant received the intended benefit of the fraudulent use of the credit cards—money—when he used the cards, he did not have to conduct any transaction or transfer to receive that benefit. Although the jury could find on this record that defendant transferred or attempted to transfer some of the fraudulently obtained

money to Russia by wire transfer, those transfers were not necessary in order for defendant to benefit from his fraudulent use of the credit cards. In fact, the transfers had the opposite effect: they made the money unavailable to him.[3]

Finally, it is worth noting that the evidence in the record in this case might support money-laundering convictions under the concealment prong of the money-laundering statutes. *See* ORS 164.170(1)(b)(B).[4] In fact, the state contends on appeal that a jury could find that the transfers *were* structured to avoid federal transaction-reporting requirements. However, defendant was not charged under the statute that prohibits such transfers, that is, under ORS 164.170(1)(b)(B). Rather, he was charged under ORS 164.170(1)(b)(A), the statute that prohibits transfers intended to promote the carrying on of unlawful activity. And, as explained above, the evidence does not support conviction of defendant under that statute.[5]

Convictions for laundering a monetary instrument reversed; remanded for resentencing; otherwise affirmed.

---

[3] The state also argues on appeal that a jury could find that the wire transfers were intended to promote tax evasion. Although it might be reasonable to suspect that defendant did not contemplate paying income taxes on his ill-gotten gains, and that the transfer of substantial sums of money to Russia might impair the government's ability to collect from defendant any taxes that he might owe, there is no basis, other than speculation, for a jury to infer that the wire transfers were intended to promote tax evasion.

[4] The text of ORS 164.170(1)(b)(B) is quoted above. 249 Or App at 700 n 1.

[5] In that regard, the Seventh Circuit commented in *Jackson* that federal prosecutors should take care in deciding which of the two prongs of the money-laundering statutes to charge—the promotion prohibition or the concealment prohibition—because it would be unusual for the government to be able to prove that a transfer ran afoul of both. 935 F2d at 842. That is an apt comment.