Argued and submitted November 3, 1997, complaint dismissed April 15, 1999

In re Complaint as to the Conduct of

# PAUL BLAYLOCK,
*Accused.*

## (OSB 94-91; SC S43713)

978 P2d 381

Paul Blaylock, Portland, argued the cause and filed the briefs *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief on behalf of the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.*

PER CURIAM

* Fadeley, J., retired January 31, 1998, and did not participate in this decision. Graber, J., resigned March 31, 1998, and did not participate in this decision.

## PER CURIAM

■     In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating Code of Professional Responsibility Disciplinary Rule (DR) 2-104(A) (permitting lawyer to initiate personal contact with prospective client for purposes of obtaining professional employment only under specified circumstances). A trial panel of the Disciplinary Board found that the accused had violated DR 2-104(A) and determined that he should receive a public reprimand. The accused sought review. ORS 9.536(1); Bar Rules of Procedure (BR) 10.1 and 10.3. Our review is *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of proving misconduct by clear and convincing evidence. BR 5.2. Evidence is clear and convincing when "the truth of the facts asserted is highly probable." *In re Claussen*, 322 Or 466, 468, 909 P2d 862 (1996).

On *de novo* review, we conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated DR 2-104(A). Accordingly, we dismiss the Bar's complaint.

The Bar has proved the following facts by clear and convincing evidence. The accused is both a lawyer admitted to practice law in Oregon and a physician licensed to practice medicine in Oregon and Washington. He had been practicing emergency medicine with privileges at various area hospitals since 1975 and had been practicing law with a Portland firm since 1984. The accused's law practice consisted primarily of defending asbestos claims and representing medical and health professionals.

With respect to the dual nature of the accused's professional life, the trial panel made the following findings of fact, which we adopt:

> "During the accused's ten years of practice he has accepted approximately 23 cases involving personal injury claims from motor vehicle accidents. Most of those claims were referred to him by personal friends. The balance of cases were referred to him by other members of [his] firm. The accused has never represented any of his medical patients in his dual capacity as a lawyer. The accused has

treated thousands of persons injured in automobile accidents, has extensive personal contact with nurses, EMTs, police, ambulance drivers and other doctors who come into contact with accident victims, all of whom are in a position to refer personal injury accident claims to the accused. Despite opportunities to do so, the accused has never solicited cases from those accident victims, has not requested or sought to represent personal injury clients with whom he has been in contact in a hospital setting, and has not received referrals for personal injury cases from persons at any hospital where he practices medicine. When the accused did receive a referral of a personal injury claim that [his firm] was willing to accept on a contingent fee basis, the accused usually referred the matter to another attorney in the firm to work up the case. In an effort to review the profitability of contingent fee work, the firm determined that none of the cases brought into the firm by the accused involved patients at hospitals where the accused also practiced medicine."

We take the following additional facts from the record. On June 23, 1991, Sam Nelson was involved in a three-vehicle automobile accident that killed one of his sisters and injured another. Nelson was seriously injured in the crash and was taken by ambulance to Southwest Washington Medical Center. Within several hours of the collision, Nelson's parents learned of the accident and went to the hospital. Ultimately, they were joined there by other family members and friends, including Nelson's wife.

Testimony before the trial panel concerning the timing and details of the events that occurred at the hospital conflicted in several respects. The trial panel concluded that "[r]esolution of these conflicts on the basis of credibility was unnecessary to a determination of the essential and material facts * * *." We agree. For purposes of our analysis, there is one central, undisputed set of facts: While the Nelson family was at the hospital awaiting news of Nelson's condition, the accused, who at that time was working a shift in the hospital's emergency room, approached the Nelson family, identified himself as a lawyer, gave them his business card, and informed them that they could contact him if they needed legal advice.

Concerning the specific circumstances of that contact, we adopt the trial panel's findings of fact:

"On June 24, 1991, the accused received a telephone call from a woman who he believed was a nurse at the ICU * * *. The presumed nurse explained that there was a man in the ICU who was seriously injured in an accident and was concerned about how he was going to feed his children. He was not told of the facts of the motor vehicle accident. She asked the accused if he would mind speaking with the family about their legal situation. The accused did not question the nurse about her sources of information or ask whether the family wanted her to contact an attorney on their behalf. He did not ask the person to have the family first contact him. He simply responded to the request from a person whom he believed was a nurse acting as a good samaritan. This person was not known to the accused. The accused was not familiar with the names of nurses outside the emergency room. Neither the accused nor the Bar were unable [sic] to locate any ICU nurse or other person that actually made this telephone call to the accused.

"However at no time did any member of the Nelson family, including Sam Nelson, [Nelson's surviving sister] or [Nelson's wife] ask a nurse or other person to contact a lawyer on their behalf. At no time during June 23 or June 24, 1991 did they have any facts or information to indicate that a lawyer was being contacted on their behalf. If they needed to immediately contact a lawyer, they already knew [another] attorney * * *. The person who contacted the accused, if indeed a nurse, was acting without the knowledge or consent of any members of the Nelson family."

Before this court, the Bar does not contest the accused's assertion that, in approaching the Nelson family, he was responding to a telephone call from a presumed nurse. The accused explained his purpose in doing so in the following testimony, which we credit:

"You have to understand, I'm still working downstairs [when the accused met with the Nelson family], I'm still on duty, so I only had a moment. I went up there [to the ICU where the Nelson family was waiting] to do—I went up there to do three things. I went up there to respond to what I thought was an invitation. And I left a busy emergency department and I only had a few moments. I went up there to respond to what I thought was an invitation by a family

in need. I gave them my business card and told them that I couldn't talk to them regarding legal advice at the time, but if they wished to call me that this is how they could reach me."

We adopt as well the following additional findings of the trial panel:

"At first the Nelson family thought that the accused was Sam's doctor. They had not yet heard about Sam's condition and the accused was dressed in medical scrubs. When the accused contacted the Nelson family he was wearing emergency room garb consisting of a scrub suit, goggles, jacket and ID badge. Because of the accused's attire some members of the Nelson family mistook the accused as Sam Nelson's surgeon.

"When the accused went to the waiting room outside the ICU, he introduced himself as 'Dr. Blaylock.' He told the family that he was also a lawyer and that he had been asked to come up to speak with them. All persons present in the waiting room agreed that the accused gave the Nelson family his business card from his law practice and informed them that they * * * could contact him if they needed to do so for legal advice. Several members of the Nelson family were affronted that a lawyer had approached them in the waiting room about representing them, but said little to the accused. Others were impressed that a professional was dually qualified as a doctor and a lawyer. The accused's card was handed to and taken by a member of the family." (Footnote omitted.)

Several days later, as a result of the personal contact, a family friend met with the accused at the accused's law office to discuss the accident and Nelson's legal situation. Ultimately, Nelson, his wife, and his sister each decided to retain the accused to represent them concerning the accident. In early 1994, the claims were settled. Nelson, however, was dissatisfied with the amount of the settlement and, on March 21, 1994, complained to the Bar about the accused's conduct at the hospital. The Bar filed a formal complaint that led to the present proceedings.

Before the trial panel, the accused denied that he had violated DR 2-104(A). He also argued that DR 2-104(A)

violates Article I, section 8, of the Oregon Constitution, and the First Amendment to the United States Constitution.[1] As noted, the trial panel concluded that the accused violated DR 2-104(A) and also rejected the accused's constitutional challenges.[2]

■       At the time of the accused's alleged misconduct, DR 2-104 provided:

"(A)   Subject to the provisions of DR 2-101 [which are inapplicable here], a lawyer may initiate personal contact with a prospective client for the purpose of obtaining professional employment only in the following circumstances:

"(1)   If the prospective client is a close friend, relative, former client, or one whom the lawyer reasonably believes to be a client;

"(2)   Under the auspices of a public or charitable legal services organization; or

"(3)   Under the auspices of a bona fide political, social, civic, fraternal, employee, or trade organization whose purposes include but are not limited to providing or recommending legal services, if the legal services are related to the principal purposes of the organization.

"(B)   For the purpose of DR 2-104, 'personal contact' means in-person or telephone contact with an individual or entity. Direct mail advertising is not considered 'personal contact' under this rule, but is otherwise subject to the requirements of DR 2-101."[3]

None of the circumstances set out in paragraphs (1) through (3) above is present in this case. Accordingly, our

---

[1] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The First Amendment to the United States Constitution provides, in part:

"Congress shall make no law * * * abridging the freedom of speech * * *."

[2] Because we conclude that the accused did not violate DR 2-104(A), we need not address the accused's constitutional arguments.

[3] The court adopted amendments to DR 2-104(B) in 1998. Supreme Court Order No. 98-104 (November 5, 1998). Those amendments are inapplicable here.

task is to determine whether the accused violated the prohibition in DR 2-104 by "initiating" personal contact with a prospective client for the purpose of obtaining professional employment.[4]

DR 2-104 does not provide a specific definition of the key term, "initiate," in that rule. The dictionary definition of that term is:

> "to begin or get going: make a beginning of: perform or facilitate the first actions, steps, or stages of * * * to bring about the initial formation of: ORIGINATE * * *." *Webster's Third New Int'l Dictionary,* 1164 (unabridged ed 1993).

The definition of the term "initiate" and the nature of the prohibition embodied in DR 2-104 indicate that a lawyer must act intentionally to violate that rule. To act with an intentional state of mind, an accused must act "with the conscious objective or purpose to accomplish a particular result." *See In re Allen,* 326 Or 107, 122, 949 P2d 710 (1997) (applying that definition of the state of mind of "intent"). *See also American Bar Association's Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (same). In the context of DR 2-104(A), the Bar must prove by clear and convincing evidence that the accused acted with the conscious objective or purpose to "initiate" personal contact with a prospective client in order to obtain professional employment.

As noted, the Bar does not contest the accused's assertion that he was responding to a nurse's telephone call, which we have described above. The Bar also does not contest the trial panel's finding that the accused acted with a subjective good faith belief that he was responding to a family invitation conveyed through the nurse. The Bar argues, however, that the intervention here of an intermediary—the nurse—between the accused and the prospective client imposed on the accused, at a minimum, the duty to direct a series of clarifying questions to the nurse to ensure that the Nelson family actually desired contact with the accused. We acknowledge that asking questions to clarify the prospective client's state

---

[4] This court has not construed DR 2-104(A) to date. In *In re Baer,* 298 Or 29, 35, 688 P2d 1324 (1984), the court summarily held that the Bar had not proved by clear and convincing evidence that the accused lawyer had violated an earlier version of DR 2-104(A).

of mind in these circumstances reflects prudent practice. However, we can find no support for compelling that prudent practice as an ethical requirement under DR 2-104(A).

The appropriate focus in this case is the intentional state of mind that the Bar must prove to prevail when charging a violation of DR 2-104. In that regard, we conclude that the Bar's case falls short. As we have found above, the accused responded to what he believed in good faith was a family invitation, conveyed through someone that he believed was a nurse, for contact with him. It follows from that finding that the Bar has not proved by clear and convincing evidence that the accused intended to originate the client contact himself. Accordingly, we hold that the accused did not violate DR 2-104.

Complaint dismissed.