Argued and submitted September 17, 2009, decision of Court of Appeals reversed; judgment of circuit court affirmed March 25, 2010

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# MATTHEW ABRAM RADER,
*Respondent on Review.*

## (CC 05C48687; CA A132153; SC S056821)

228 P3d 552

Jamie K. Contreras, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Zachary Lovett Mazer, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

KISTLER, J.

**KISTLER, J.**

Ordinarily, fourth-degree assault is a misdemeanor. ORS 163.160(2). It becomes a Class C felony, however, when the victim's minor child "see[s]" or "directly perceive[s]" the assault. ORS 163.160(3)(c); ORS 163.160(4).[1] Those statutes give rise to two questions in this case. The first is what the phrase "directly perceive[s]" means. The second is whether the evidence was sufficient to permit a reasonable trier of fact to find that a child who was in her bedroom "perceived" an assault on her mother that occurred outside the child's closed bedroom door. In resolving those questions, the Court of Appeals held that a child perceives the assault when the child is conscious of and recognizes the assault; it then ruled that the evidence was insufficient to meet that standard. *State v. Rader*, 223 Or App 169, 173, 175-76, 195 P3d 438 (2008). We allowed the state's petition for review and now reverse the Court of Appeals decision.

Because this appeal arises from a motion for a judgment of acquittal, we state the facts in the light most favorable to the state. *State v. Fries*, 344 Or 541, 543, 185 P3d 453 (2008). Defendant lived with the victim and the victim's two minor children, aged 11 and three, in a two-bedroom apartment. Defendant and the victim had a brief but unstable relationship, marked primarily by defendant's controlling behavior and assaultive conduct. On July 25, 2005, defendant began berating the victim about her relationship with her former boyfriend, who was the father of the victim's younger daughter. Defendant believed that the victim spent too much time picking up her daughter at her former boyfriend's house, and he suspected that the victim had been engaging in sexual relations with her former boyfriend.

Defendant began by screaming and yelling at the victim. He called her a "lying fucking whore" and asserted, in more graphic terms, that she was probably engaging in oral sex with her former boyfriend when she went over to pick up their daughter. He continued by yelling that he knew that the victim wanted someone else on the side and asserted,

---

[1] Other circumstances also will elevate fourth-degree assault from a misdemeanor to a felony. In describing the statute, we focus only on the circumstances at issue in this case.

again in more graphic terms, that she probably was engaged in other kinds of sexual relations with her former boyfriend and that, if she were not, she wanted to do so.

Defendant's anger turned physical. The victim testified that defendant "became very agitated, to the point where he was using his body to—using his weight to force me around with just his chest and his shoulders." Defendant pushed the victim out of their bedroom where the argument had begun, into the hallway, and around the hallway until he backed her into the open doorway of her younger daughter's room, where the daughter was watching television.[2]

As defendant pushed the victim into the doorway of her daughter's room, he continued to scream at her. The victim took a step into her daughter's room to turn up the television "so she would be distracted by [sic] all of the yelling and screaming." Defendant then reached behind the victim and closed the bedroom door. He grabbed the victim's head with both hands and headbutted her, striking the victim's head with his head. The victim testified that the sound of that blow was "very loud." She explained: "From the sound, to me, I thought that my head was cracked open." The force of the blow made the victim's head recoil, causing her head to hit her daughter's bedroom door "very loudly." The victim fell to the floor, let out a cry of pain, and got back to her own bedroom where she sat on the floor between her bed and the wall. The victim's head began to swell where defendant had hit her. Defendant got ice and made the victim put it on her head "to make it go away so nobody could see it," and he told the victim not to go to work "unless [she] wanted everybody to know our business, unless [she] wanted everybody to know what he had done."

At trial, the prosecutor asked the victim whether her daughter could have heard the sounds arising from the assault through the closed bedroom door. Specifically, on direct examination, the prosecutor asked her, "[A]t the times when these arguments, these assaultive incidents were happening, there was yelling and screaming, would someone who was in either of the bedrooms, even with the door shut,

---

[2] The victim's older daughter was not home at the time of this incident.

be able [to] hear what's going on?" The victim answered "yes."[3]

The victim did not contact the police after the July 25 incident. A few days later, defendant assaulted the victim again. After the second assault, the victim petitioned for a restraining order and also contacted the police. As a result of defendant's acts, the state charged him with, among other things, felony fourth-degree assault arising out of the July 25 incident.[4]

At the close of the state's evidence, defendant moved for a judgment of acquittal. Regarding the July 25 incident, defendant argued that no reasonable trier of fact could find that the child perceived the assault and thus witnessed it. Defendant did not contend that there was insufficient evidence to convict him of misdemeanor fourth-degree assault. Rather, his challenge was limited to the element that elevated the misdemeanor to a felony. The trial court denied defendant's motion. Later, the trial court, sitting as the trier of fact, found that the child had witnessed defendant's assault on her mother and convicted him of, among other things, felony fourth-degree assault for the July 25 assault. Defendant appealed that conviction, arguing that the trial court had erred in denying his motion for judgment of acquittal. The Court of Appeals agreed with defendant, reversed his conviction for felony fourth-degree assault, and remanded for entry of a conviction of misdemeanor fourth-degree assault. *Rader*, 223 Or App at 176.

On review, the state argues that the Court of Appeals erred in interpreting the term "witness" in ORS 163.160(3)(c), and that, alternatively, even if the Court of

---

[3] On cross-examination, defense counsel asked the victim: "In your opinion, was there anything with regards to the headbutting incident from which your daughter would have been able to determine that you had been headbutted?" After defense counsel rephrased the question a couple of times, the victim responded: "At the time it happened? Not unless she actually saw it." Because we view the facts in the light most favorable to the state, we do not consider whether the victim's answer on cross-examination would have permitted the trier of fact to find that the child could not have heard the sounds arising from the assault.

[4] Those two incidents resulted in multiple charges and convictions. On appeal, defendant challenged only the felony assault conviction arising out of the July 25 incident. Because he has not challenged the other convictions arising out of the two incidents, we have limited our discussion of the facts to the July 25 incident.

Appeals' interpretation of that term were correct, the Court of Appeals still erred in finding that there was insufficient evidence to submit the charge of felony fourth-degree assault to the trier of fact. We begin with the statutory interpretation question that the state raises and first set out the text of the relevant statutes.

ORS 163.160(1) provides, in part, that a person commits the crime of fourth-degree assault if the person "[i]ntentionally, knowingly, or recklessly causes physical injury to another." Ordinarily, fourth-degree assault is a misdemeanor. ORS 161.160(2). However, it will become a Class C felony if, among other things:

> "The assault is committed in the immediate presence of, or is witnessed by, the person's or the victim's minor child or stepchild or a minor child residing within the household of the person or victim."

ORS 163.160(3)(c). ORS 163.160(4) defines the term "witnessed." It provides that "an assault is witnessed if the assault is seen or directly perceived in any other manner by the child."

The interpretative issue in this case is narrow. The state does not contend that the assault occurred in the child's immediate presence or that the child saw the assault. It argues only that the child heard and thus "directly perceived" the assault on her mother. On that point, the state and defendant agree that the use of the word "directly" requires that the child's perception be contemporaneous. And neither side disputes that "perceives" means:

> "to become aware of through the senses: NOTE, OBSERVE ‹ roughness and smoothness—R.S. Woodworth› * * * *esp*: to look at ‹people have become so used to the sight of ruins that they hardly ~ them any more—Norbert Mhlen›."

*Webster's Third New Int'l Dictionary* 1675 (unabridged ed 2002).

Where the parties differ is in defining precisely what the child must perceive or, in the dictionary's terms, "become aware of" in order for the child to perceive the assault. The state argues that, to perceive an assault aurally, a child need only be aware of the sounds emanating from the assault; the

child need not be aware that those sounds emanate from assaultive conduct. Defendant, for his part, argues that perceiving an assault requires not only awareness of the sounds created by the assaultive conduct but also some minimal level of awareness that those sounds emanate from assaultive conduct.

The state's interpretation of ORS 163.160(4) is difficult to square with the text of that statute. As noted, ORS 163.160(4) provides that "an assault is witnessed if the assault is seen or directly perceived in any other manner by the child." Under the plain text of the statute, what a child must perceive or, in the dictionary's terms, "become aware of" is "the assault," not merely the sounds (or other sensory data) emanating from the assault. The text of the statute implies that the child must be aware that the sounds that he or she hears arise from assaultive conduct.

The context sheds some light on the issue. Under ORS 163.160(4), "seen" is an alternative to "directly perceived." A child will "witness" an assault if the child sees or directly perceives the assault. A child who sees an assault will be aware that someone is hitting or striking another (or engaging in other assaultive conduct). To be sure, an infant who sees an assault may have only an imperfect understanding of what he or she is observing. But we infer from the legislature's decision to juxtapose "seen" and "directly perceived" and to require that the child either see or perceive "the assault" that the legislature intended to require a minimal level of awareness that the images or sounds that a child perceives arise from assaultive conduct. *See Behnke-Walker v. Multnomah County*, 173 Or 510, 518, 146 P2d 614 (1944) (" '[T]he coupling of words together shows that they are to be understood in the same sense.' " (quoting *Neal v. Clark*, 95 US 704, 708, 24 L Ed 586 (1877))).

The legislative history provides additional insight, but it does not all point in the same direction. *See State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) ("Legislative history may be used to confirm seemingly plain meaning and even to illuminate it * * *."). Before 1999, ORS 163.160(3)(b) (1997) elevated fourth-degree assault to a felony if "[t]he assault is witnessed by the person's or the victim's minor

child," but the statute did not define "witnessed" or include "immediate presence" as an alternative basis for elevating fourth-degree assault to a felony. The legislature amended the statute in 1999 by adding "immediate presence" and defining "witnessed" as "seen or directly perceived." Or Laws 1999, ch 1073, § 1.

Initially, House Bill (HB) 3129 (1999)[5] proposed adding the phrase "committed in the immediate presence of" and defined "witnessed" for purposes of the statute as being "seen or perceived in any other manner by the child." At the first work session, Steve Dingle, representing the Oregon District Attorneys Association, spoke on behalf of the bill and described what he considered to be the reason for the bill:

> "There are judges that are interpreting [ORS 163.160(3)(b) (1997)] literally, which would require that the child actually visually see the assault. Other judges are interpreting the statute to include minor children who perhaps are on the other side of a wall, excuse me, in a bedroom that actually hear the yelling the screaming the cursing the assaulting. So this just is intended to make crystal clear that that second situation is captured by the statute."

Testimony, House Committee on Judiciary - Criminal Law, HB 3129, Apr 13, 1999, Tape 134, Side A. Dingle testified that children who hear domestic abuse are "just as traumatized as [a] child who actually sees the assault occurring," and responded to questions about vagueness by saying that the sponsors wanted to make clear with the amendments that "witnessed means more than visually observing." *Id.*

Dingle then addressed "immediate presence" and suggested that that phrase would apply to a child who was in another room but heard the sounds arising from the assault. *Id.* In response to Dingle's comments, Representative Mannix, the chair of the committee, offered a different view

---

[5] Two bills were before the House. HB 3129, as first introduced, elevated fourth-degree assault to a felony if the defendant had at least two prior domestic assault convictions. HB 3394 elevated fourth-degree assault to a felony if the defendant committed the assault in the immediate presence of the child and defined the witness to mean see or directly perceive. The legislature considered the two bills together and later incorporated HB 3394 into HB 3129. For convenience, we refer only to HB 3129.

of the terms, "immediate presence" and "witnessed." Representative Mannix observed: "Being in the other room [during an assault] may not be immediate presence. However, being in the other room and hearing the altercation means that you have witnessed because you have seen or perceived." *Id.*

Representative Mannix then distinguished "witnessed" from "immediate presence." He noted that, under the definition of "witnessed," the question was:

"Whether you heard it. Whether you saw it. [W]hat we're talking about is perception and the fact of being aware, which is what we're trying to get at, is the child being aware of this happening. And otherwise, whether you can say that they witnessed it by being aware of it happening—they were there. That's the immediate presence point."

*Id.* Dingle agreed with Representative Mannix's distinction between "witnessed" and "immediate presence." *Id.*

Later, in response to a proposal to substitute "see or heard" for "seen or directly perceived," Representative Mannix cautioned against doing so:

Representative Mannix: "If you said even 'heard,' then some lawyers are going to get at parsing down what 'heard' meant. Does that mean that you discerned what that thud sound was, and we're trying to cover, the whole point being that the traumatic impact on the child rather than some lawyer trying to parse words."

Dingle: "Chairman Mannix, that's an excellent point. I'd be very concerned that if you have the word 'heard,' that there's an element of comprehension on the part of the ch[ild]—we're going to get into that whole argument as to—"

Representative Mannix: "Did you understand what it meant when you heard that thud sound, as this man hit mommy? I'm just imagining already the parsing that might occur. * * *"

Dingle: "One of the things we'd like to do, too, is avoid, wherever possible, even bringing the child into court, and if we get into a subjective element and aspect as to whether or not the child comprehends it, then the child necessarily becomes a witness. Right now, if we have a cooperative victim, we don't even need that."

*Id.* After hearing more concerns about the possible ambiguity of the word "perceive," the committee considered using the words "seeing, heard, or felt." *Id.* However, the committee opted instead to change "perceived" to "directly perceived." Representative Mannix explained that "the point is that the child is aware of what's going on at the time it's going on." Testimony, House Committee on Judiciary - Criminal Law, HB 3129, Apr 27, 1999, Tape 162, Side A.

We draw three conclusions from the legislative history. First, the primary purpose of the bill, as explained to the committee, was to make clear that "witnessed" included hearing an assault as well as seeing it. Second, Representative Mannix explained that, in using the term "perceived," "what we're trying to get at is the child being aware of this happening." Considering his remarks in light of the proposed amendment before the committee, we conclude that "this" refers to the assault; that is, what the legislature was "trying to get at is the child being aware of [the assault] happening." Third, the colloquy between Representative Mannix and Dingle points potentially in a different direction. Their colloquy expresses a concern that children not be called as witnesses so that lawyers can parse how much the child discerned or knew.

Although the colloquy between Representative Mannix and Dingle can be read to support the state's interpretation of ORS 163.160(4), that part of the legislative history is difficult to square with the text and context of the statute, which require that the child see or perceive "the assault." *See Gaines*, 346 Or at 178 (explaining that we give text and context primacy in interpreting the legislature's intent). That colloquy is also difficult to square with the remainder of the legislative history, which contemplates that perception requires some minimal awareness that the sounds arise from assaultive conduct.

Considering the text, context, and legislative history of ORS 163.160(3)(c) and (4), we conclude that a child "directly perceives" an assault if the child contemporaneously is aware through any of the child's senses that an assault is occurring—*i.e.*, that one person is causing injury to another. *See* ORS 163.160(1)(a) (providing that a person commits

fourth-degree assault if, with the requisite mental state, the person "causes physical injury to another"). When the state contends that a child heard and thus directly perceived an assault, it is sufficient to show that the child was aware that the sounds arose from assaultive conduct. The child need not be aware of the details or the specifics of the assault.

■■ With that standard in mind, we turn to whether the trial court correctly denied defendant's motion for a judgment of acquittal. We note, at the outset, that, in deciding whether the trial court's ruling was correct, the question is whether there was sufficient evidence in the record from which a reasonable trier of fact could find the elements of the crime beyond a reasonable doubt. In making that determination, a court must resolve all conflicts of evidence in favor of the state and give the state the benefit of all reasonable inferences. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994).[6]

In this case, defendant argues that the trial court should have granted his motion for a judgment of acquittal for two reasons. First, he argues that no reasonable trier of fact could find that the sounds arising from the assault were audible through the closed bedroom door. Second, he contends that, even if a reasonable trier of fact could find that the sounds were audible, the evidence was not sufficient to find that the child was aware that the sounds arose from assaultive conduct.

■ We begin with the question whether a reasonable trier of fact could find that the sound of defendant's head

---

[6] In stating the standard of review for a motion for a judgment of acquittal, the Court of Appeals set out the standard that an instruction on an inference must meet. *See Rader*, 223 Or App at 173 (paraphrasing *State v. Rainey*, 298 Or 459, 466, 693 P2d 635 (1985)). In doing so, the Court of Appeals incorrectly conflated two related but separate issues. When a trial court instructs the jury that it may infer one fact from another, the federal constitution requires there be some "rational way the trier [of fact] could make the connection permitted by the inference." *Ulster County Court v. Allen*, 442 US 140, 157, 99 S Ct 2213, 60 L Ed 2d 777 (1979); *see Rainey*, 298 Or at 466 (citing and following *Ulster*). That issue is not present when a court decides a motion for judgment of acquittal. In that instance, no instruction tells the jury that it may infer one fact from another, and the standard stated in *Rainey* is inapposite. The applicable standard of review is instead the more familiar one—whether a reasonable trier of fact could find the elements of the crime beyond a reasonable doubt.

hitting the victim's and the sound of the victim's head hitting the child's door were audible in the child's bedroom. On that point, the victim's apartment was a small two-bedroom apartment, between approximately 800 and 900 square feet. The verbal and physical confrontation between defendant and the victim began in their bedroom, went out into the hall, and ended in the open doorway of the child's bedroom. When defendant headbutted the victim, they were standing next to the child's bedroom door. At that point, the door was closed and the television on inside the room. The victim testified that the sound of the headbutt was "very loud" and that the sound made her think that her "head was cracked open." The victim also testified that, when defendant headbutted her, her head recoiled and hit her daughter's bedroom door very loudly. Finally, when asked whether "when these arguments, these assaultive incidents were happening, there was yelling and screaming, would someone who was in either of the bedrooms, even with the door shut, be able [to] hear what's going on," the victim said "yes."

We need not decide whether the last answer alone would be sufficient to permit a reasonable trier of fact to find that the sounds arising from defendant's assaultive conduct were audible through the closed bedroom door. Even without the victim's opinion, a reasonable trier of fact could infer that the "very loud" sound of defendant's head hitting the victim's and the sound of the victim's head hitting the child's door "very loudly" were audible in the child's bedroom. Indeed, a trier of fact reasonably could infer that the noise produced by the victim's head hitting the child's bedroom door very loudly would reverberate through the child's bedroom, even with the television turned up, in the same way that a very loud knock on an outside door reverberates through a home.[7]

---

[7] The Court of Appeals questioned whether the evidence was sufficient to permit a reasonable trier of fact to find that the child heard the noises outside the door because "the victim [had] turned up the volume of the television in order to drown out the sound of the argument." *Rader*, 223 Or App at 176. We note, however, that the victim testified that she turned up the volume on the television "so [that her daughter] would be distracted by [*sic*] all of the yelling and screaming." Turning up the television so that it distracted her daughter differs from turning it up so that it drowned out the sounds of the argument, or so a reasonable trier of fact could find.

■   The remaining issue is whether a reasonable trier of fact could find that the child was aware, from hearing the sounds arising from the assault, that defendant was causing physical injury to her mother. On that issue, the sound of defendant's head hitting the victim's and the sound of the victim's head hitting the door did not occur in a vacuum. Those sounds were preceded by an intense verbal and physical confrontation. Immediately before defendant headbutted the victim, defendant was screaming at the victim in the threshold of the child's open bedroom door. The victim reached in and turned up the television to distract her daughter. Given those facts, a reasonable trier of fact could find that the child was aware of the physical confrontation between defendant and her mother. Indeed, the confrontation had spilled over into the child's bedroom, and the victim sought to distract her daughter's attention from it by turning up the television.

Additionally, a reasonable trier of fact could find that the child was aware that defendant was the aggressor and her mother the object of his aggression.[8] And, given the sounds of the headbutt and of the victim's head hitting the door, followed immediately by a cry of pain from the child's mother, a reasonable trier of fact could find that the child was aware that defendant had hurt her mother—*i.e.*, that defendant had caused physical injury to her mother and thus had assaulted her. The child need not have perceived the specifics of the assault or comprehended the consequence of defendant's actions to come within the legislature's concern to protect children from exposure to domestic assault.

As this case demonstrates, when the state seeks to prove that a child heard and thus directly perceived an assault, the child need not testify. The state may rely, as it did in this case, on the close spatial and temporal connection among the child, the verbal confrontation, and the assault that immediately followed to prove that the child was aware of defendant's assault on her mother. Alternatively, the state may introduce evidence of the child's reaction after the

---

[8] We do not mean to suggest that this inference is necessary to the state's proof, only that it is an additional circumstance in this case that bears on the question whether a reasonable trier of fact could find that the child was aware of the assaultive conduct.

assault occurs to prove that the child was aware of the assault. The nature and types of evidence on this point are far too varied to attempt to catalog them, but it is important to emphasize that the evidence must be sufficient for the trier of fact to draw a reasonable inference not only that the child could have heard the sounds arising from the assault but that the child also was aware of those sounds and that they arose from assaultive conduct. The evidence in this case met that standard, and the trial court correctly denied defendant's motion for a judgment of acquittal.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.