No. 3 January 19, 2018 351

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

ROBERT L. BRANCH,
aka Robert Lee Branch, Jr.,
aka Rueben Netzer,
*Petitioner on Review.*

(CC 14CR00250; CA A158214; SC S064318)

On review from the Court of Appeals.*

Argued and submitted May 8, 2017.

Brett Allin, Deputy Public Defender, Salem, argued the cause and filed the briefs for the petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Jacob R. Brown, Assistant Attorney General, Salem, argued the cause and filed the brief for the respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Nakamoto, Flynn, and Duncan, Justices, and Landau, Senior Justice pro tempore.**

FLYNN, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____
\* Appeal from Jackson County Circuit Court, J. Adam Peterson, Judge. 279 Or App 492, 381 P3d 1082 (2016).

\*\* Brewer, J., retired June 30, 2017, and did not participate in the decision of this case. Nelson, J., did not participate in the consideration or decision of this case.

**FLYNN, J.**

This case presents a narrow question regarding the meaning of ORS 162.375(1), which defines the crime of "initiating a false report." Defendant was convicted of that crime based on evidence that, in response to questions from sheriff's deputies about a report that defendant left the scene of a traffic collision without exchanging the required driver information, defendant falsely claimed that he left the scene because the other driver had pointed a gun at him. Defendant urges us to hold that a person does not "initiat[e] a false report" within the meaning of ORS 162.375(1), if the person lies in response to police questioning "about a report someone else initiated" and, thus, that the evidence is insufficient to permit his conviction under that statute. Although we agree that the legislature did not intend the statute to apply when a person merely responds to police questioning with false information regarding the circumstances of the same crime or emergency situation about which the person is being questioned, defendant's proposed rule sweeps too broadly. We conclude that the legislature intended the phrase "initiates a false alarm or report" to reach, at a minimum, the conduct of a person who, during questioning about one crime or emergency situation, falsely alleges new circumstances to which the law enforcement agency is reasonably likely to respond as a separate crime on an emergency basis.[1]

## I.   BACKGROUND

Defendant was driving while intoxicated and rear-ended another driver. He left the scene of the collision without providing the information that ORS 811.700 requires of drivers who are involved in an accident that results in damage to a vehicle. The other driver recorded defendant's license plate number, called 9-1-1, and reported defendant's conduct. Deputy Duke of the Jackson County Sheriff's Office used that information to locate and question defendant at

---

[1] We need not resolve whether the legislature intended ORS 162.375 also to apply to reports of new crimes to which law enforcement is likely to respond on a non-emergency basis, such as a report about a "cold case," because there is evidence in this case that the deputies responded to defendant's false allegation as if the gun presented an ongoing threat.

his home about the circumstances of the collision and about defendant's reason for leaving the scene. Defendant admitted to Duke that he had consumed alcohol, driven the car involved in the collision, and left the scene after the collision. When Duke asked defendant why he had left the scene, defendant falsely claimed that he had left because the other driver had pointed a gun at him. Given that claim, Duke was concerned about the safety of another sheriff's deputy, Lance, who was still at the scene with the other driver, and Duke called over the radio that "there was the possibility of a gun in play."

Upon learning from dispatch about defendant's claim that the other driver brandished a gun, Lance believed that the conduct defendant described constituted a crime. He questioned the other driver about defendant's claim and extensively searched the other driver and his car, but he found no gun.

Lance then joined Duke at defendant's house to complete his accident investigation. Lance pressed defendant about whether he wanted to stick to his statement about the gun in order to give defendant a chance to keep "from getting into additional trouble," if possible. Without specifically saying whether he had found a gun, Lance warned defendant: "If you tell me that he had a gun and cannot describe for me the kind of gun that I found in the vehicle, then I'm going to arrest you for what's called initiating a false report, which is giving me information that's not true about a weapon being pointed." Defendant continued to insist that he had seen a gun and even elaborated about the type of gun and about the other driver's actions regarding the gun, including adding a claim that the other driver had threatened, "I will kill you." The deputies had already concluded, however, that the gun story was false and arrested defendant without further investigation.

Among other offenses, the state charged defendant with one count of knowingly initiating a false report, ORS 162.375. Defendant moved for a judgment of acquittal on that count, but the trial court denied the motion. The jury found defendant guilty of initiating a false report, and defendant appealed.

The Court of Appeals affirmed defendant's conviction based on his repetition and embellishment of the false accusation when questioned by Lance. *State v. Branch*, 279 Or App 492, 381 P3d 1082 (2016). In doing so, the court emphasized its holding in prior cases that "evidence that a person has lied in response to police questioning in the course of an investigation is not enough to convict the person of initiating a false report." *Id*. at 496 (citing *State v. McCrorey*, 216 Or App 301, 306, 172 P3d 271 (2007)). Under that standard, the court concluded that defendant's initial false statement to Duke was insufficient to support the conviction but that the circumstances surrounding his repetition of the false accusation to Lance permitted the jury to find that defendant knowingly initiated a false report, in violation ORS 162.375. *Branch*, 279 Or App at 496-97.

## II.   DISCUSSION

Defendant sought review in this court, but both parties challenge the decision of the Court of Appeals in part. Defendant argues that neither his initial false statement nor his repetition of the statement was made under circumstances that permit a finding that he violated ORS 162.375. The state responds that either false statement is sufficient to support a finding that defendant violated the statute and urges this court to correct the Court of Appeals' statement to the contrary.

ORS 162.375(1) provides:

"A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

Although the statute describes a number of elements, there is no dispute that defendant acted "knowingly," that his allegation that the other driver brandished a gun was false, or that his false allegation was "transmitted" to a "law enforcement agency." Rather, defendant's challenge to his conviction puts at issue only the meaning of the phrase "initiates a false alarm or report."

Defendant argues that the phrase "initiates a false alarm or report" does not include false statements that are made "in response to police questioning during an investigation of a report that someone else had initiated." Under that construction of the statute, defendant contends, the Court of Appeals correctly concluded that defendant did not violate ORS 162.375(1) by making his false accusation about the gun to Duke but erred in concluding that defendant violated the statute when he repeated the false accusation to Lance.

The state acknowledges that the statute may exclude some lies that are made in response to police questioning, but contends that a person can be found to have initiated a false alarm or report during an encounter that the person did not initiate "when the person falsely reports a new criminal matter." Under that test, the state contends, both defendant's false statement to Duke and his false statement to Lance support his conviction for "initiating a false report" because defendant's accusation that the other driver brandished a gun was a report about a new criminal matter.

Defendant's argument that the statute excludes any false accusations made in response to police questioning primarily focuses on the legislative history of ORS 162.375(1). We have repeatedly emphasized, however, that our first step in construing a statute is to examine the statutory text and context, because "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) (internal quotation marks omitted). That is where we begin our analysis in this case as well.

A.  *Text and Context*

As a starting point, we emphasize that the object of the verb "initiates" is not "the encounter." Rather, for a violation of ORS 162.375, it is the "false alarm or report" that must be initiated. Thus, the text of the statute does not necessarily exclude false accusations made in response to questioning that was initiated by law enforcement, unless that limitation is implied by the phrase "initiates a false alarm or report."

1.  *"Initiates"*

Defendant emphasizes the word "initiates" in arguing that the text of ORS 162.375 excludes false accusations made in response to questioning. The legislature did not provide a definition for "initiates," but it is a word of common usage, and we frequently consult dictionary definitions to determine the meaning of such terms "on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014). Defendant emphasizes that common meanings of the verb "initiate" include formulations such as "to begin or set going **:** make a beginning of"; "to bring about the initial formation of"; and "to mark the beginning of." *Webster's Third New Int'l Dictionary* 1164 (unabridged ed 2002).[2] We agree that those definitions generally capture the meaning that the legislature intended when it used the term "initiates" in ORS 162.375(1). *See In re Blaylock*, 328 Or 409, 416, 978 P2d 381 (1999) (quoting and relying upon the *Webster's* definition in construing term "initiate" as used in Code of Professional Responsibility Disciplinary Rule 2-104). While that ordinary meaning of the term "initiates" may make it clear that the statute applies in some situations, such as a person calling an emergency line to falsely report that a crime is occurring, it is less clear what the legislature intended when the person makes an identical report during contact that law enforcement or an emergency organization initiated.

Defendant proposes that the meaning suggested by the definitions quoted above "confirms" that ORS 162.375(1) excludes "responsive reports to police questioning." We do not share defendant's conviction that the word "initiates" so readily resolves the meaning of ORS 162.375(1). Nothing about Duke's questioning raised the possibility that the

---

[2] Although *Webster's Third* was originally published in 1961, in subsequent republishing, new definitional material appears in an addendum section. As a result, we have explained, "any version of *Webster's Third*—regardless of its copyright date—provides a relevant source of ordinary meaning for statutes enacted any time after 1961, if not earlier." *State v. Eastep*, 361 Or 746, 751 n 2, 399 P3d 979 (2017).

other driver had brandished a gun. Instead, defendant introduced that new circumstance, and his false allegation caused Lance to undertake an investigation into a new crime, separate from the crimes about which defendant was being questioned. In that sense, defendant's false allegation "mark[ed] the beginning of" any information being provided to law enforcement about a gun crime and "set going" the law enforcement response to *that* crime. Thus, defining the term "initiates" does not resolve whether the legislature intended to preclude the statute from applying to a person who falsely informs law enforcement officers of a new, ongoing crime whenever the false allegation is made in response to a police inquiry.

   2.   *"Report"*

         The statutory text and context suggest that the legislature intended to draw a different line between a false statement that "initiates a false alarm or report" and a false statement that does not—a line that depends on the nature of the false statement rather than whether a law enforcement question supplied the opportunity or motivation for the false statement. Like the word "initiates," the word "report" is also a word of common usage that the legislature has not defined. Dictionary definitions of the noun "report" vary from the very casual ("common talk" and "rumor") to somewhat formal ("something that gives information : a usu[ally] detailed account or statement ***") to formal ("a usu[ally] formal account of the results of an investigation given by a person or group authorized or delegated to make the investigation"). *Webster's* at 1925. All of the definitions, however, describe a communication of information.

         Other parts of ORS 162.375 suggest that the "report" with which the legislature was concerned is one that informs a law enforcement agency or other emergency organization that a situation exists of a type to which the organization responds with resources. *See Force v. Dept. of Rev.*, 350 Or 179, 188, 252 P3d 306 (2011) ("'[C]ontext' includes, among other things, other parts of the statute at issue."). First, the kind of false "report" that the statute prohibits is a report "that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies

involving danger to life or property."[3] ORS 162.375(1). In addition, the statute as a whole suggests that the legislature intended to criminalize "reports" about the types of situations to which the law enforcement or other emergency organization is reasonably likely to respond with its resources. That intention is reflected in the statute's specification that the sentence for any person convicted of "initiating a false report" shall include "a requirement that the person repay the costs incurred in responding to and investigating the false report" and that, "[i]f the response to the false report involved the deployment of a law enforcement special weapons and tactics (SWAT) team or a similar law enforcement group," the sentence must include a minimum term of incarceration. ORS 162.375(3).

Of course, many types of false statements that are made during the course of an existing police investigation can trigger the expenditure of resources.[4] For example, when Lance questioned defendant about leaving the scene of the collision, if defendant had falsely claimed that he had an alibi for the time of the collision, the deputies might have expended resources to investigate the false claim of alibi. That, however, does not make the alibi necessarily a "report," as that term is used in ORS 162.375. In other words, we recognize that the legislature may choose to address a perceived problem—here the waste of emergency

---

[3] Although it might seem possible to read the text in such a way that the phrase "that deals with emergencies involving danger to life or property" modified "false alarm or report," we conclude that the phrase, instead, modifies—and limits—"other organization." That conclusion flows both from the grammatical rule of the "last antecedent" and from the fact that leaving the noun "other organization" unlimited could expand the scope of liability under the statute far beyond what we conclude the legislature intended. *See State v. Clemente-Perez*, 357 Or 745, 754, 359 P3d 232 (2015) ("The doctrine of the last antecedent provides that '[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent,'" and that "'[t]he last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence.'" (Quoting *State v. Webb*, 324 Or 380, 386, 927 P2d 79 (1996).)).

[4] Although ORS 162.375 appears to be designed to prevent the waste of the resources of an organization that responds to emergencies, we emphasize that the text does not suggest that an actual response by the organization is an element of the crime. Rather, as indicated above, the statute makes any response to a false report a factor to be taken into account in fashioning the sentence. ORS 162.375(3).

resources—without necessarily prohibiting every contribution to the problem.

We infer from the broader statutory context that a false "report," as that term is used in ORS 162.375, describes a more specific conveying of information than simply making a false statement. That context includes two statutes that prohibit the making of any false "statement" under oath: ORS 162.065 (providing that a person who knowingly "makes a false sworn statement *** in regard to a material issue" commits the Class C felony of "perjury") and ORS 162.075 (providing that a person who "makes a false sworn statement" commits the Class A misdemeanor of "false swearing"). Those statutes were enacted as part of the same comprehensive revision of the Criminal Code that created ORS 162.375, and they supply pertinent context for the meaning of ORS 162.375. Or Laws 1971, ch 743, §§ 183, 184, 212. *See State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012) (a statute's context includes "related statutes"); *see also Miller v. Water Wonderland Improvement District*, 326 Or 306, 309-10 n 4, 951 P2d 720 (1998) (considering a statute enacted in the same bill as the statute at issue as relevant context for statutory interpretation). Similarly, two other statutes make it a crime to knowingly give very specific false information to law enforcement: ORS 162.385 (prohibiting person from knowingly giving "a false or fictitious name, address or date of birth to any peace officer for the purpose of" the officer issuing a citation or arresting the person on a warrant) and ORS 807.620 (prohibiting person from knowingly giving "a false or fictitious name, address or date of birth to any police officer who is enforcing motor vehicle laws").

If ORS 162.375(1), which contains no requirement that the false "report" be provided under oath, prohibited any false statement to an emergency organization, then it would render both the prohibitions on sworn false statements and the prohibitions on providing specific categories of false information largely redundant.[5] We have emphasized that

[5] A violation of ORS 162.375 is a Class A misdemeanor, as are most of the statutes described above. However, the crime of "perjury," ORS 162.065, is a Class C felony, and in that sense is the one statute in the group that is not entirely redundant of ORS 162.375.

"an interpretation that renders a statutory provision meaningless should give us pause, both as a matter of respect for a coordinate branch of government that took the trouble to enact the provision into law and as a matter of complying with the interpretive principle that, if possible, we give a statute with multiple parts a construction that 'will give effect to all' of those parts." *State v. Cloutier*, 351 Or 68, 98, 261 P3d 1234 (2011) (quoting ORS 174.010). Moreover, the legislature's use of the distinct term "report" in ORS 162.375(1) suggests that the legislature intended to describe something different from a "statement." *See also Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 323, 374 P3d 829 (2016) ("[I]f the legislature uses *different* terms in related statutes, it likely intended them to have different meanings." (emphasis in original.)).

Thus, our examination of text and context suggests that the legislature intended a "report," within the meaning of ORS 162.375, to refer to a communication that informs a law enforcement agency or other emergency organization that a situation exists of a type to which the organization would respond with an expenditure of resources. In the context of a communication to a law enforcement agency, the phrase "false report" includes, at a minimum, a communication that falsely alleges circumstances to which the agency is reasonably likely to respond as a current crime or emergency. Conversely, it does not include a statement that merely conveys information to which the agency would respond only because the information is relevant to an existing report or alarm.

This case illustrates the type of communication that meets the intended definition of a "report." The deputies responded and began an investigation after the other driver called 9-1-1 to communicate that defendant had fled the scene of the collision, and then Lance investigated whether the other driver was in possession of a weapon after defendant falsely alleged that the driver had pointed a gun at him, because Duke considered the allegation to represent a safety concern and Lance believed that the alleged conduct constituted a crime. Both were "reports." However, defendant's statement admitting that he had consumed alcohol was not a "report," because it did not communicate a

circumstance of a type to which law enforcement is likely to respond independent of its relevance to the existing investigation into whether defendant committed the crime of driving while intoxicated.

### 3.  *"Initiates a False Alarm or Report"*

That understanding of the term "report" provides a more clear suggestion of what "initiate[] a false alarm or report" means in the context of law enforcement questioning that the person did not initiate. Text and context suggest that a person "initiates a false alarm or report" if the person's communication "begin[s]" or "mark[s] the beginning of" informing the organization about the circumstances that are the subject of the report. In the context of questioning initiated by law enforcement, that suggested meaning includes, at a minimum, falsely reporting new circumstances to which the law enforcement agency is reasonably likely to respond as a separate, ongoing crime or emergency. Conversely, the text and context suggest that a person does not violate ORS 162.375 during law enforcement questioning by falsely confirming or denying knowledge of a report or alarm that already is under investigation, or by falsely conveying information about circumstances to which the agency would be unlikely to devote resources, except for whatever relevance the information may have to an existing criminal investigation (*i.e.*, by making a false statement that is not a "report").

## B.   *Legislative History*

Despite the contrary meaning suggested by the statutory text and context, defendant argues that the legislative history demonstrates an intent "to exclude false reports that are responsive to police interrogation" from the prohibition of ORS 162.375. We disagree.

The legislature adopted ORS 162.375 in 1971, as part of a comprehensive revision of the Oregon Criminal Code. Or Laws 1971, ch 743, § 212. The text of ORS 162.375, which we have discussed in detail above, was proposed to the legislature by the Oregon Criminal Law Revision Commission, a body consisting of legislators and non-legislators that the legislature created in 1967 to revise the criminal laws of the

state. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 212, 207 (July 1970); *see State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980) (describing history of the commission). A subcommittee of the commission considered preliminary draft language for the section that became ORS 162.375 and then provided a tentative draft, along with commentary, to the commission. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Tentative Draft No. 1, § 8, 49 (Feb 1970). The full commission later approved the subcommittee's wording for the draft legislation. *See* Minutes, Criminal Law Revision Commission, May 15, 1970, 61-62 (approving section setting out new crime of "initiating a false report"). The commission then presented to the legislature a Final Draft of the proposed criminal code, along with commentary. Final Draft and Report § 212, 207; *Gaines*, 346 Or at 178.

This court has looked to commentaries produced by both the commission and its subcommittees as legislative history for the revised criminal code. *E.g.*, *Gaines*, 346 Or at 178; *see State v. Woodley*, 306 Or 458, 462, 760 P2d 884 (1988) (unless a contrary indication exists, court assumes that the legislature accepted the commission's explanations for its drafting choices). That legislative history strongly supports our conclusion that the legislature intended to criminalize "reports" to an emergency organization about situations of a type to which the organization responds with resources. As explained in the commentary to the Final Draft and Report, the new provision that became ORS 162.375 was intended to address the waste and diversion of emergency resources:

> "Criminal statutes dealing with false fire alarms are found in nearly all American jurisdictions. The rationale supporting criminal liability is based upon the waste of government resources involved and the creation of circumstances where personnel and equipment are made unavailable to deal with legitimate emergencies. Section 212 is intended to reach fire and police departments, and all other organizations, public or private, that respond to emergency alarms involving danger to life or property."

Commentary to Final Draft and Report § 212, 208-09. The commentary to an earlier draft elaborated on that intent:

"The proposed section will provide law enforcement agencies with increased protection from unjustified harassment and interference with official duties." Commentary to Tentative Draft No. 1, Art 22 § 8, 51.

The legislative history also supports our conclusion that the legislature did not intend to criminalize all false statements made in response to a police inquiry. The commentary to both the Preliminary Draft and later Tentative Draft approved by the subcommittee contrast the intended scope of ORS 162.375 with similar statutes from other jurisdictions. The commentary describes a Wisconsin statute that "would seem to cover any false oral statement given to a police officer in the course of an investigation" and concludes that the Wisconsin approach "may be unduly broad" because, "[i]f such statements are to be subject to prosecution, it seems reasonable that they be reduced to writing and signed by the declarant, and that an intent to mislead be established." Commentary to Tentative Draft No. 1, Art 22 § 8, 50; Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Preliminary Draft No. 1, Art 22 § 11, 51 (May 1969). The commentaries add that a similar provision in the "Canadian Criminal Code is even broader," prohibiting "'causing a public officer to enter upon an investigation by *** doing anything *** to divert suspicion from himself.'" Commentary to Tentative Draft No. 1, Art 22 § 8, 50; Commentary to Preliminary Draft No. 1, Art 22 § 11, 51 (omissions in both commentaries).

However, nothing in the commentary that the commission provided to the legislature suggests that ORS 162.375 would permit false reports of a new crime or emergency as long as the report is made in response to police questioning. To support his argument that the legislative history, nevertheless, demonstrates that intent, defendant relies on changes to the Preliminary Draft language that were recommended by the commission's subcommittee and on comments during the hearing at which the subcommittee discussed the proposed changes. Language in the Preliminary Draft referred to the crime as "Rendering a False Report" and applied if a person "causes *** to be transmitted" either a "false alarm of fire or other emergency" or "false information relating to an offense." Criminal

Law Revision Commission Proposed Oregon Criminal Code, Preliminary Draft No. 1, Art 22 § 11 (May 1969). After discussions in the subcommittee, members ultimately voted to make various changes, including changing the name of the crime from "Rendering a False Report" to "Initiating a False Report" and replacing the phrase "causes *** to be transmitted" with "knowingly initiates." Criminal Law Revision Commission Proposed Oregon Criminal Code, Tentative Draft No. 1, Art 22 § 8 (Feb 1970).[6]

Defendant argues that the change to "initiates" reflects a decision by the subcommittee that, "categorically, the statute should not punish" false reports that are "responsive to police questioning." As we will explain, defendant overstates the significance of the subcommittee discussions and of the addition of the term "initiates."[7] For the most part, the comments that defendant cites are entirely consistent with the rule that the text and context of ORS 162.375(1) suggest—that a person "initiates a false alarm or report" during questioning initiated by law enforcement if the person falsely informs the questioners about new circumstances of the type to which the law enforcement agency is reasonably likely to respond as a new crime or emergency.

Defendant relies on the following history. Thomas O'Dell, a representative of the Attorney General, proposed adding the word "initiates" to address a concern, expressed by Representative Harl Haas, that the earlier language permitted any oral statement "requested and solicited by the police officer [to] be the subject of prosecution" and that, "[i]f every time you talk to a police officer you are in essence

---

[6] The subcommittee also eliminated language from the preliminary draft that would have prohibited transmitting "false information relating to an offense" to law enforcement agencies. Criminal Law Revision Commission, Preliminary Draft No. 1, Art 22, § 11, 50; Criminal Law Revision Commission, Tentative Draft No. 1, Art 22, § 8, 49.

[7] Although the change from "causes to be transmitted" to "knowingly initiates" also could be seen as intended to broaden the scope of the statute beyond the person actually making a report, the commentary to both the Preliminary Draft and the Final Draft reflect that the commission intended that broad scope from the outset. *See* Final Draft and Report, § 212, 208-09 (The draft explains that "[t]he section applies whether the false alarm was directly or indirectly caused to be transmitted. Criminal liability should not be dependent on whether the person acted himself or caused another to act for him."); Criminal Law Revision Commission, Preliminary Draft No. 1, Art 22, § 11.

testifying under oath, subject to the penalties of being prosecuted for your statement if it's an error, that's a pretty big policy statement." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Sept 16, 1969, Tape 81, Side 2 (statement of Haas); Minutes, Criminal Law Revision Commission, Sept 16, 1969, 18. Defendant highlights O'Dell's suggestion that his proposed substitution of "initiates" would make the statute applicable when a person "starts the ball rolling." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Sept 16, 1969, Tape 81, Side 2. Defendant also cites an additional comment by Haas that "we're talking about * * * initiating the wheels of law enforcement to go in action on an assertion you've made, as opposed to just a verbal statement to a police officer."[8] *Id*.

Although defendant assumes that those comments reflect a belief that the proposed language would exclude a false report made in response to police questioning, Chairman Wallace Carson used the same "ball rolling" phrase to explain his opinion that a person who intentionally lies during a police investigation should be responsible: "[W]hen they start the ball rolling, they're going to be responsible." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Sept 16, 1969, Tape 81, Side 2.

Moreover, defendant assumes a false dichotomy. If, in response to police questioning about one crime, a person reports a new crime, that report "starts the ball rolling" or sets going "the wheels of law enforcement" on a response to that new crime as fully as if the same report were made through an unprompted call to the police station. Indeed that point is illustrated by the facts of this case—when defendant reported to Duke that a man who was not previously suspected of any crime had engaged in conduct that Duke considered to present a safety risk and that Lance considered to be a crime, the report started the "ball rolling" and the "wheels of law enforcement" turning toward

---

[8] This court has previously quoted tape recorded statements made during meetings of a subcommittee of the Criminal Law Revision Commission as part of our inquiry into legislative intent. *See*, *e.g.*, *Eastep*, 361 Or at 757; *State v. Simonov*, 358 Or 531, 544, 368 P3d 11 (2016); *Garcia*, 288 Or at 416.

the investigation of an entirely new crime that the deputies were not otherwise investigating.

Although other isolated comments during the subcommittee hearing seemingly come closer to supporting defendant's construction of the statute, in context the statements are less clear than defendant believes. For example, defendant highlights a comment that he attributes to Project Director Donald Paillette, who described his understanding of the line that the statute should draw as: "It's 'who called the fuzz?'" Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Sept 16, 1969, Tape 81, Side 2. But Paillette's colorful phrasing must be understood in the context of the contrast he was drawing with false statements made during a "follow-up investigation"—a type of statement that he believed the statute should not prohibit. In other words, the comment could be understood as, figuratively, "who called the fuzz [on a new criminal investigation]?"

Moreover, Paillette's comment was immediately followed by the comment of another subcommittee member who expressed the extreme opposite perspective: "I think it's the same thing, a waste of governmental resources[;] *** you're sending the police on a wild goose chase by giving them false information." *Id.* Several other members then expressed concern that, if the statute prohibited all false statements to the police, it would criminalize a common situation in which people who are approached by the police during an investigation falsely deny knowledge of the particular crime or suspect in order avoid becoming involved. *Id.* As one member emphasized, although that "might not be the best thing for a person to do socially," it does not seem to "rise[] to the level of a crime." *Id.* Representative Haas then offered his opinion that "[t]his is more directed at the guy who calls up" and reports an ongoing crime. *Id.* After those comments, the subcommittee voted to substitute the term "initiates" in place of "rendering" and "causes *** to be transmitted." Minutes, Criminal Law Revision Commission, Subcommittee No. 2, Sept 16, 1969 at 19; Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Sept 16, 1969, Tape 81, Side 2.

Ultimately, the legislative history for ORS 162.375 does not disclose clear evidence that the legislature intended to exclude reports of a new ongoing crime that a person makes during police questioning about another matter, simply because the report is also "responsive to police questioning." Although several subcommittee members expressed concern about situations in which a person responds to a police question with a false statement that is relevant only to the existing investigation, no member raised the example of a person who falsely reports a new crime in a way that is also responsive to a police question. Thus, no member of the subcommittee offered an opinion about whether the statute should apply when a person sets the law enforcement "ball rolling" in the direction of a separate criminal investigation in that way.

Significantly, in the most meaningful indication of intent to emerge from the subcommittee—the version of the commentary that was ultimately forwarded to the full commission, and then to the legislature—the only limitation on the scope of "initiates a false alarm or report" is the suggestion that the laws of Wisconsin and Canada were "unduly broad" in prohibiting "any false oral statement," or even "doing anything" to divert suspicion, during the course of an investigation. Commentary to Tentative Draft No. 1, Art 22, § 8, 50; Commentary to Preliminary Draft No. 1, Art 22, § 11, 51. Thus, the legislative history provides no basis for us to depart from the meaning suggested by the "more persuasive evidence of the intent of the legislature" that is supplied by the text and context of the statute. *See Gaines*, 346 Or at 171; *see also Cloutier*, 351 Or at 102 ("The fact of the matter, however, is that the legislative history \*\*\* provides a little something for everyone and does not clearly resolve the matter one way or the other.").

We conclude that, at a minimum, in the context of questioning initiated by law enforcement, a person "initiates a false alarm or report" within the meaning of ORS 162.375, if the person falsely alleges new circumstances to which the law enforcement agency is reasonably likely to respond as a current separate crime or emergency in itself, not merely because the false information is relevant to

the crimes or emergency about which the person is being questioned.[9]

## C.  *Defendant's Motion for Judgment of Acquittal*

Under that test, the facts of this case permit a finding that defendant violated ORS 162.375.[10] As defendant acknowledges, the jury could find that defendant falsely told Duke that the other driver had pointed a gun at him. Lance testified that he conducted a search and questioned the other driver because he believed that the conduct defendant described constituted a crime. Thus, the evidence permitted a finding that defendant's false accusation was a false "report." The jury could also find that defendant "initiated" that false report, because there was evidence that defendant was the first person to tell the deputies that the other driver had pointed a gun at defendant and there was also evidence that Lance would not have investigated a gun-related crime or searched the other driver's car if not for defendant's report about the gun.

We thus agree with the Court of Appeals' that defendant's conviction should be affirmed. For the reasons discussed, however, we disagree with the Court of Appeals that only defendant's subsequent elaboration on his false report supports his conviction under ORS 162.375.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[9] We emphasize that the statute also requires the person to act "knowingly." Unless context requires otherwise, "knowingly," as the term is used in chapter 743, Oregon Laws 1971 (the 1971 Oregon Criminal Code) means, "with respect to conduct or to a circumstance described by a statute defining an offense, *** that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." ORS 161.085(8). Although that requirement is not at issue in the present case, it limits the circumstances under which a person can be convicted for making a false report that is responsive to a police question.

[10] We review a trial court's denial of a motion for judgment of acquittal to determine "whether there was sufficient evidence in the record from which a reasonable trier of fact could find the elements of the crime beyond a reasonable doubt." *State v. Rader*, 348 Or 81, 91, 228 P3d 552 (2010). In so doing, we "resolve all conflicts of evidence in favor of the state and give the state the benefit of all reasonable inferences." *Id.*